# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **No. 24-CV-88** |
| and the STATE OF NORTH CAROLINA | ) | |
| ex rel. JOSH STEIN, Attorney General, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| FIRST NATIONAL BANK OF PENNSYLVANIA, | ) | |
| in its corporate capacity and as successor in interest | ) | |
| to YADKIN BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

## INTRODUCTION

1.      The United States of America (the "United States") brings this action against First National Bank of Pennsylvania ("FNB" or the "Bank") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f.

2.      Attorney General Josh Stein on behalf of the State of North Carolina ("North Carolina") brings this action against FNB under the North Carolina Unfair and Deceptive Practices Act ("NCUDPA"), N.C. Gen. Stat. § 75-1.1 *et seq*, and the regulations implementing ECOA ("Regulation B"), 12 C.F.R. pt. 1002, pursuant to the authority under 12 U.S.C. § 5552(a)(2)(B).

3.      The FHA, ECOA, and the NCUDPA prohibit creditors, such as banks, from discriminating in home loans or other residential credit transactions on the basis of race, color, national origin, and other characteristics.

4.      "Redlining" is one type of discrimination prohibited under the FHA, ECOA, and the NCUDPA. Redlining occurs when lenders deny or discourage applications or avoid providing loans and other credit services in neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

5.      From 2017 through 2021 (the "Relevant Time Period"), FNB (including as successor in interest to Yadkin Bank, which it acquired in March 2017) engaged in a pattern or practice of unlawful redlining. As alleged in detail herein, FNB avoided providing home loans and other mortgage services in majority-Black and Hispanic neighborhoods in the Charlotte, North Carolina, and Winston-Salem, North Carolina markets.

6.      FNB's redlining practices included locating and maintaining nearly all its branch locations and mortgage loan officers outside of majority-Black and Hispanic neighborhoods during the Relevant Time Period. The Bank relied on mortgage loan officers concentrated in majority-white areas as the primary source for generating referrals and loan applications, thereby avoiding majority-Black and Hispanic areas. Further, the Bank maintained inadequate internal fair lending policies and procedures to ensure that the Bank was positioned to provide equal access to majority-Black and Hispanic neighborhoods. As a result of these practices, the Bank generated disproportionately low numbers of loan applications and home loans from majority-Black and Hispanic

2

neighborhoods in its self-designated Community Reinvestment Act ("CRA") Assessment Areas in the Charlotte and Winston-Salem markets compared to similarly-situated lenders.

7.     FNB's conduct and practices were intended to deny, and had the effect of denying, residents of majority-Black and Hispanic neighborhoods equal access to home loans and otherwise discouraged these residents from applying for home loans. The Bank's conduct was not justified by a business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## JURISDICTION

8.     This Court has subject-matter jurisdiction over the United States' claims under 28 U.S.C. § 1331, 28 U.S.C. § 1345, 42 U.S.C. § 3614(a), and 15 U.S.C. § 1691e(h) because those claims arise under the laws of the United States, and the United States brings this case as a plaintiff.

9.     This Court has subject-matter jurisdiction over North Carolina's claims under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 12 U.S.C. § 5552(a)(2)(B) because some of those claims arise under the laws of the United States and because this Court has supplemental jurisdiction over the state law claims.

10.     This Court may exercise personal jurisdiction over FNB because it transacted business and committed the acts at issue in the Middle District of North Carolina.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

12.     Plaintiff the United States brings this action to enforce the provisions of the FHA and ECOA. The FHA and ECOA authorize the United States Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the United States Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

13.     Plaintiff North Carolina brings this action to enforce the provisions of the NCUDPA and Regulation B, 12 C.F.R. § 1002. The NCUDPA authorizes the North Carolina Attorney General to bring a civil action whenever he concludes that the interests of the public require him to prosecute a violation of the NCUDPA. N.C. Gen. Stat. § 75-15. The Dodd-Frank Act further authorizes the North Carolina Attorney General to bring suit against a national bank in federal district court to enforce a regulation prescribed by the Consumer Financial Protection Bureau ("CFPB") under a provision of Title 12, so long as he provides notice to the CFPB and the Office of Comptroller of the Currency ("OCC"). 12 U.S.C. § 5552(a)(2)(B), (b)(1). The North Carolina Attorney General has provided the required notice. Regulation B was prescribed by the CFPB pursuant to its authority under 12 U.S.C. § 5512 to implement the ECOA.

4

14.     Defendant First National Bank of Pennsylvania is a national bank headquartered in Pittsburgh, Pennsylvania, that offers commercial banking, consumer banking (including mortgage lending), and wealth management services. The Bank currently maintains approximately 350 branches throughout the District of Columbia, Maryland, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, and West Virginia. The Bank currently operates 16 branches in the Charlotte Metropolitan Statistical Area ("MSA") and 15 branches in the Winston-Salem MSA. As of November 2023, the Bank had assets of over $45 billion.

15.     FNB first entered the Charlotte MSA and Winston-Salem markets in March 2017 when it acquired Yadkin Bank.

16.     FNB is subject to the regulatory authority of the OCC. Because its assets exceed $10 billion, FNB is also regulated by the CFPB.

17.     FNB is subject to the FHA, ECOA, their respective implementing regulations (24 C.F.R. pt. 100, 12 C.F.R. pt. 1002), and the NCUDPA.

18.     FNB is a "creditor" within the meaning of ECOA and Regulation B, 15 U.S.C. § 1691a(e); 12 C.F.R. § 1002.2(*l*), and is engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

### The Charlotte MSA and FNB's Assessment Area

19.     During the Relevant Time Period, the Charlotte MSA was comprised of eleven counties in two states: Anson, Cabarrus, Gaston, Iredell, Lincoln, Mecklenburg,

5

Rowan, and Union Counties in North Carolina, and Chester, Lancaster, and York Counties in South Carolina.

20.     The Charlotte MSA has approximately 2.6 million residents. According to data from the United States Census Bureau, in 2020, the region was 22.5% non-Hispanic Black ("Black"), 60.3% non-Hispanic white ("white"), and 10.3% Hispanic or Latino. As used in this Complaint, a "majority-Black and Hispanic" tract is one where more than 50% of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau.[1]

21.     As a depository bank, FNB is subject to the requirements of the Community Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901–2908, and its enabling regulations, which require most banks to meet the credit needs of the communities that they serve. Each bank subject to the CRA self-identifies the communities that it serves in the bank's "assessment areas." Federal regulators look at a bank's assessment area in evaluating whether an institution is meeting the credit needs of its entire community.

22.     FNB's self-designated Charlotte Assessment Area consists of: Iredell, Mecklenburg, Rowan, and Union Counties in North Carolina, and York County in South Carolina. These are contiguous counties where approximately 74% of the Charlotte MSA's population resides. The Bank's Charlotte Assessment Area contains 127 majority-Black

---

[1] The complaint uses "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably.  The complaint does the same for "majority-white tract," "majority-white area," and "majority-white neighborhood."

6

and Hispanic census tracts (approximately 87% of majority-Black and Hispanic census tracts in the Charlotte MSA) and 392 total census tracts.

### The Winston-Salem MSA and FNB's Assessment Area

23.     During the Relevant Time Period, the Winston-Salem MSA was comprised of five counties in North Carolina: Davidson, Davie, Forsyth, Stokes, and Yadkin Counties.

24.     The Winston-Salem MSA has approximately 675,000 residents. According to data from the United States Census Bureau, in 2020, the region was 17.4% Black, 67.6% white, and 10.5% Hispanic or Latino.

25.     FNB's self-designated Winston-Salem Assessment Area consists of the following counties in North Carolina: Davidson, Forsyth, Stokes, and Yadkin Counties. These are contiguous counties where approximately 94% of the Winston-Salem MSA's population resides. The Bank's Winston-Salem Assessment Area contains 32 majority-Black and Hispanic census tracts (all of the majority-Black and Hispanic census tracts in the Winston-Salem MSA) and 143 total census tracts.

### FNB Lacks Branches in Majority-Black and Hispanic Neighborhoods

26.     During the Relevant Time Period, FNB operated its branches in the Charlotte and Winston-Salem MSAs so as to serve the credit needs of residents in majority-white neighborhoods and avoid serving the credit needs of residents in majority-Black and Hispanic neighborhoods.

27.     During the Relevant Time Period, FNB operated between 13 and 16 branches in the Charlotte MSA (18 distinct branches operated at various times). All of these branches

7

were "full-service" branches, which offered the full suite of FNB's retail products and services, including accepting residential mortgage loan applications. All of these branches generated mortgage loan applications during the Relevant Time Period.

28.     Although 32% of the census tracts in FNB's Charlotte Assessment Area are majority-Black and Hispanic, only one of the 18 branches that existed at different times during the Relevant Time Period was in a majority-Black and Hispanic census tract. None of the remaining 17 branches (including two new branches that opened in 2021) were located in majority-Black and Hispanic tracts. FNB did not open any new branches in majority-Black and Hispanic tracts in the Charlotte MSA during the Relevant Time Period. *See* Exhibit A.

29.     During the Relevant Time Period, FNB operated between 15 and 18 branches in the Winston-Salem MSA. All of these branches were "full-service" branches, which offered the full suite of FNB's retail products and services, including accepting residential mortgage loan applications. All but one of these branches generated mortgage loan applications during the Relevant Time Period.

30.     Although 22% of the census tracts in FNB's Winston-Salem Assessment Area are majority-Black and Hispanic, only one of the 18 branches that existed at different times during the Relevant Time Period was in a majority-Black and Hispanic census tract, and FNB closed that branch in 2021. None of the remaining 17 branches were located in majority-Black and Hispanic tracts. FNB did not open any new branches in majority-Black

and Hispanic tracts in the Winston-Salem MSA during the Relevant Time Period. *See* Exhibit B.

31.     FNB knew since at least 2017 that its branches in the Charlotte and Winston-Salem Assessment Areas were located overwhelmingly in majority-white neighborhoods and were not serving the credit needs of communities of color. Nonetheless, although FNB opened two new branches in the Charlotte Assessment Area during the Relevant Time Period, neither of those branches was in a majority-Black and Hispanic neighborhood, and FNB closed the only branch in a majority-Black and Hispanic census tract in the Winston-Salem market in 2021.

32.     By concentrating nearly all of its branches outside of majority-Black and Hispanic neighborhoods, FNB discouraged residents who lived in those neighborhoods from applying for and obtaining home loans and restricted their access to the Bank's credit and mortgage lending services.

**FNB Relied on Mortgage Loan Officers Who Were Located Almost Exclusively in Majority-White Neighborhoods to Generate Mortgage Loan Applications**

33.     During the Relevant Time Period, FNB's mortgage loan officers served the credit needs of majority-white neighborhoods but did not serve the credit needs of majority-Black and Hispanic neighborhoods in the Charlotte or Winston-Salem MSAs.

34.     During the Relevant Time Period, FNB maintained 36 branches in the Charlotte and Winston-Salem MSAs (18 in each market), but only one branch in each market was located in a majority-Black and Hispanic census tract (and FNB closed the

9

branch in the Winston-Salem MSA in 2021). During the Relevant Time Period, FNB did not assign even one loan officer to work in either of the two FNB branches located in majority-Black and Hispanic neighborhoods.

35.    During the Relevant Time Period, FNB relied overwhelmingly on mortgage loan officers, none of whom worked in branches in majority-Black and Hispanic neighborhoods, to generate mortgage loan applications in the Charlotte and Winston-Salem MSAs, including through development of referral sources and outreach to potential customers related to the Bank's mortgage lending services.

36.    The Bank did not monitor nor document where its mortgage loan officers developed referral sources or to whom loan officers distributed marketing or outreach materials related to mortgage lending services to ensure that such sources or distribution occurred in all neighborhoods throughout the Charlotte and Winston-Salem markets.

37.    During the Relevant Time Period, FNB's team of loan officers in the Charlotte and Winston-Salem MSAs was overwhelmingly white. Out of 42 loan officers in the Charlotte MSA, FNB employed only two Black loan officers, and one of the Black loan officers sold reverse mortgages, a specialized loan product. FNB employed only three Hispanic loan officers in the Charlotte MSA. FNB did not employ any Black or Hispanic loan officers in the Winston-Salem MSA during the Relevant Time Period.

38.    The Bank's marketing strategy in the Charlotte and Winston-Salem markets during the Relevant Time Period was focused on raising brand awareness and promoting

its services. This broad-reaching strategy was not designed to, nor did it effectively, attract mortgage applications from majority-Black and Hispanic communities.

39.     FNB's marketing efforts in the Charlotte and Winston-Salem markets during the Relevant Time Period included direct mailing and search engine marketing. However, search engine marketing efforts were targeted to zip codes within 10 miles of an FNB branch, and direct mail marketing was targeted to homes within a 10-15 minute drive of a branch. Because FNB's branches were concentrated in white communities, this practice focused direct mailing and search engine marketing on white communities.

40.     Although documents indicate that FNB recognized the need to conduct marketing targeted to "minority" areas, FNB did not conduct marketing targeted to communities of color in the Charlotte or Winston-Salem markets, including majority-Black and Hispanic communities, during the Relevant Time Period. FNB did not conduct any marketing in Spanish.

## Disproportionately Low Numbers of Home Loan Applications from Majority-Black and Hispanic Neighborhoods in the Charlotte and Winston-Salem Markets

41.     FNB's policies and practices alleged herein have discouraged applicants in majority-Black and Hispanic neighborhoods in the Charlotte and Winston-Salem MSAs from applying for and obtaining home loans and other mortgage-related services.

42.     FNB's own data on loan applications and originations that it is required to report to regulators under the Home Mortgage Disclosure Act of 1975 ("HMDA"), 12 U.S.C. §§ 2801–2811, confirms that FNB has avoided serving majority-Black and

Hispanic neighborhoods in the Charlotte and Winston-Salem MSAs during the Relevant Time Period. *See* Exhibits C & D.

43.     During the Relevant Time Period, FNB significantly underperformed its "peer lenders" in generating home mortgage loan applications from majority-Black and Hispanic areas in its Charlotte and Winston-Salem Assessment Areas. "Peer lenders" are similarly-situated financial institutions that received between 50% and 200% of the Bank's annual volume of home mortgage loan applications.

44.     The disparity between the rate of applications generated by FNB and the rate generated by its peer lenders from majority-Black and Hispanic areas is both statistically significant—meaning unlikely to be caused by chance—and sizable across the five-year time period from 2017 through 2021, in both its Charlotte and Winston-Salem Assessment Areas.

45.     During the Relevant Time Period, FNB received 3,756 HMDA-reportable mortgage loan applications within its Charlotte Assessment Area. In none of those years did more than 9% of its applications come from residents of majority-Black and Hispanic census tracts. By contrast, during the same time period, FNB's peers generated between 19% and 23% of their 161,298 total applications from these same majority-Black and Hispanic census tracts.

46.     In other words, FNB's peers generated applications from residents of majority-Black and Hispanic census tracts at more than 2.5 times the rate of FNB. When disparities were calculated for individual years, FNB's peers generated applications from

those tracts at a rate between 2.5 and 3.0 times the rate of FNB. These disparities are statistically significant across the five-year Relevant Time Period and in every year analyzed.

47.     During the Relevant Time Period, FNB received 3,320 HMDA-reportable mortgage loan applications within its Winston-Salem Assessment Area. In none of those years did more than 3% of its applications come from residents of majority-Black and Hispanic census tracts. By contrast, during the same time period, FNB's peers generated between 10% and nearly 13% of their 42,593 total applications from these same majority-Black and Hispanic census tracts.

48.     In other words, FNB's peers generated applications from residents of majority-Black and Hispanic census tracts at more than four times the rate of FNB. When disparities were calculated for individual years, FNB's peers generated applications at a rate between 4.2 and 5.1 times the rate of FNB. These disparities are statistically significant across the five-year Relevant Time Period and in every year analyzed.

49.     FNB performed poorly relative to its peers in generating applications from majority-Black and Hispanic census tracts across the income spectrum. In the Charlotte Assessment Area, FNB performed especially poorly in middle-income and upper-income majority-Black and Hispanic census tracts, as compared to low-income and moderate-income tracts. In other words, the poor performance was not only in majority-Black and Hispanic areas that are low income. Similarly, in the Winston-Salem Assessment Area, FNB performed worse in moderate-income and middle-income majority-Black and

13

Hispanic census tracts, as compared to low-income tracts (there were no upper-income majority-Black and Hispanic tracts).

50.    FNB's lending performance in majority-minority[2] census tracts is consistent with its performance in majority-Black and Hispanic census tracts. FNB lagged behind its peers in generating mortgage loan applications in both the Bank's Charlotte and Winston-Salem Assessment Areas. Those disparities are statistically significant in both areas.

51.    The statistically significant disparities between applications FNB generated from majority-Black and Hispanic neighborhoods and those that its peers generated show that there were residents in majority-Black and Hispanic areas in FNB's Charlotte and Winston-Salem Assessment Areas who were seeking home loans. FNB had no legitimate, non-discriminatory reason to draw so few applications from these areas.

52.    These figures show a statistically significant failure by FNB, relative to its peer lenders, to draw applications for home loans and provide residential mortgage services to residents of majority-Black and Hispanic census tracts in the Charlotte and Winston-Salem Assessment Areas on a non-discriminatory basis during the Relevant Time Period.

**Disproportionately Low Number of Mortgage Loans Made in Majority-Black and Hispanic Neighborhoods of the Charlotte and Winston-Salem Markets**

53.    FNB's lending practices have discouraged prospective applicants in majority-Black and Hispanic neighborhoods from seeking home loans. As a result, the

---

[2] For the purposes of this Complaint, "minority" refers to people who identified as Black, Hispanic, Asian, Native American, Native Hawaiian, or Pacific Islander in the U.S. Census.

14

Bank made a smaller percentage of HMDA-reportable residential mortgage loans in these neighborhoods compared to its peers during the Relevant Time Period.

54.     During the Relevant Time Period, FNB made 2,488 HMDA-reportable residential mortgage loans in its Charlotte Assessment Area. The percent made to residents of majority-Black and Hispanic census tracts ranged from a low of 4.9% in 2019 to a high of 8.9% in 2017 and 2018. By contrast, FNB's peers made 97,513 HMDA-reportable residential mortgage loans in the same area, and the percent going to residents of majority-Black and Hispanic census tracts ranged from 17.5% (2020) to 21.2% (2018). In other words, FNB's peers made loans in those areas at a rate approximately 2.5 times higher than FNB.

55.     When disparities were calculated for individual years, FNB's peers in its Charlotte Assessment Area made loans in majority-Black and Hispanic census tracts at a rate between 2.3 and 4.1 times the rate of FNB. The disparities are statistically significant across the five-year Relevant Time Period and for each individual year during the Relevant Time Period.

56.     During the Relevant Time Period, FNB made 2,272 HMDA-reportable residential mortgage loans in its Winston-Salem Assessment Area. The percent made to residents of majority-Black and Hispanic census tracts ranged from a low of 1.4% in 2020 to a high of 3.1% in 2017. By contrast, FNB's peers made 24,683 HMDA-reportable residential mortgage loans in the same area, and the percent going to residents of majority-Black and Hispanic census tracts ranged from 8.8% (2020) to 10.9% (2018).

57. When disparities were calculated for individual years, FNB's peers in its Winston-Salem Assessment Area made loans in majority-Black and Hispanic census tracts at a rate between 3.0 and 6.4 times the rate of FNB. The disparities are statistically significant across the five-year Relevant Time Period and for each individual year during the Relevant Time Period.

58. The statistically significant disparities between the proportion of home loans FNB made from majority-Black and Hispanic neighborhoods and those that its peers made show that there were residents in majority-Black and Hispanic areas in the Charlotte and Winston-Salem markets who were seeking and qualified for home loans. FNB had no legitimate, non-discriminatory reason to make so few home loans from these areas.

59. These figures show a statistically significant failure by FNB, relative to its peer lenders, to make home loans and provide residential mortgage services to residents of majority-Black and Hispanic census tracts in the Charlotte and Winston-Salem markets on a non-discriminatory basis during the Relevant Time Period.

**FNB's Inadequate Internal Fair-Lending Monitoring & Failure to Address Fair Lending Problems**

60. During the Relevant Time Period, the Bank's internal fair lending policies and procedures were inadequate to ensure that the Bank provided equal access to credit to majority-Black and Hispanic neighborhoods in the Charlotte or Winston-Salem MSAs.

61. Beginning in at least 2018, FNB knew that its applications and lending in communities of color trailed that of its peers in the Charlotte and Winston-Salem markets. During the Relevant Time Period, FNB annually conducted statistical analyses of its

16

performance relative to peers lending in majority-minority census tracts, which revealed that it was lagging behind its peers. The results of those analyses were regularly presented to senior Bank officials.

62.     Despite this knowledge, FNB failed to take any meaningful steps during the Relevant Time Period to address its poor performance relative to its peers' lending in majority-Black and Hispanic or other communities of color in the Charlotte or Winston-Salem markets.

63.     Although it conducted annual statistical analyses, FNB had no written procedures setting out how the analyses should be conducted, who should be informed of the results, or how results should be addressed until 2022, after it became aware of a redlining investigation by the U.S Department of Justice. The absence of such formal procedures contributed to FNB's failure to adequately evaluate and respond to the results of the redlining analyses.

64.     FNB also knew that it had low levels of mortgage lending to communities of color compared to peer lenders in numerous other markets in addition to Charlotte and Winston-Salem, yet it failed to take meaningful steps to provide equal access to credit in these areas during the Relevant Time Period.

**The Governments' Investigation**

65.     On November 19, 2021, the United States notified FNB that it was opening an investigation into whether the Bank had engaged in unlawful lending discrimination in

17

violation of the FHA and ECOA and requested documents related to FNB's lending practices for the time period January 1, 2017, to the present.

66.    On July 20, 2022, the United States notified FNB of North Carolina's involvement in the investigation.

67.    FNB's discriminatory practices as described herein have intended to discriminate and have had the effect of discriminating on the basis of race, color, and national origin.

## COUNT I – VIOLATION OF THE FAIR HOUSING ACT
### (Plaintiff United States)

68.    The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

69.    FNB's policies and practices constitute the unlawful redlining of majority-Black and Hispanic communities in the Charlotte and Winston-Salem MSAs on account of the racial and national origin composition of those communities. FNB's policies and practices were intended to deny, and had the effect of denying, equal access to home loans to residents of majority-Black and Hispanic communities and those seeking credit for properties located in those communities. The Bank's conduct was not justified by a business necessity or legitimate business considerations.

70.    FNB's actions as alleged herein constitute:

a.    Discrimination on the basis of race, color, and national origin in making available residential real estate-related transactions, or in the

18

terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulations, 24 C.F.R. §§ 100.110(b), 100.120;

b. The making unavailable or denial of dwellings to persons because of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulations, 24 C.F.R. § 100.50(b)(3); and

c. Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(2), 100.65.

71. FNB's policies and practices as alleged herein constitute:

a. A pattern or practice of resistance to the full enjoyment of rights secured by the FHA; and

b. A denial of rights granted by the FHA to a group of persons that raises an issue of general importance.

72. FNB's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

19

73.     Persons who have been victims of FNB's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of the Bank's conduct in violation of the Fair Housing Act, as described above.

## COUNT II – VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
### (Plaintiff United States)

74.     The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

75.     FNB's policies and practices constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-Black and Hispanic communities in the Charlotte and Winston-Salem MSAs and engaging in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit on the basis of race, color, and national origin in violation of ECOA and Regulation B. 15 U.S.C. § 1691 *et seq.*; 12 C.F.R. § 1002.4(a)-(b).

76.     FNB's policies and practices as alleged herein constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, 15 U.S.C. § 1691e(h).

77.     FNB's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

78.     Persons who have been victims of FNB's discriminatory policies and

practices are "aggrieved" as defined in 15 U.S.C. § 1691e(i), and may have suffered damages as a result of the Bank's conduct in violation of the Equal Credit Opportunity Act, as described above.

## COUNT III – VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT
### (Plaintiff North Carolina)

79.     North Carolina incorporates all prior paragraphs of the Complaint as if fully set forth herein.

80.     North Carolina General Statute § 75-1.1(a) declares unfair and deceptive acts or practices in or affecting commerce to be unlawful.

81.     FNB's actions in connection with the practices set out above were in and affecting commerce in North Carolina.

82.     FNB's acts and practices as alleged above were unfair to consumers in North Carolina, and therefore violate North Carolina General Statute § 75-1.1(a).

83.     FNB's unfair business practices include, but are not limited to:

    a.     Redlining majority-Black and Hispanic communities on account of the racial and national origin composition of those communities;

    b.     Denying equal access to home loans to residents of majority-Black and Hispanic communities and those seeking credit for properties located in those communities, without a business necessity or legitimate business considerations to justify those actions;

    c.     Discriminating on the basis of race, color, and national origin in

21

making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions;

d.    Making unavailable or denying dwellings to persons because of their race, color, and national origin;

e.    Discriminating on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings;

f.    Discouraging prospective applicants from applying for credit on the basis of race, color, and national origin;

g.    Violating the federal Fair Housing Act and federal Equal Credit Opportunity Act; and

h.    Engaging in unlawful discriminatory housing practices in violation of the North Carolina Fair Housing Act, N.C. Gen. Stat. §§ 41A-4, -5, a state law that largely mirrors the federal Fair Housing Act.

## COUNT IV – VIOLATION OF DODD-FRANK ACT
### (Plaintiff North Carolina)

84.    North Carolina incorporates all prior paragraphs of the Complaint as if fully set forth herein.

85.    The Dodd-Frank Act authorizes the North Carolina Attorney General to bring suit against a national bank in federal district court to enforce a regulation prescribed

by the CFPB under a provision of Title 12. 12 U.S.C. § 5552(a)(2)(B), (b)(1). Regulation B was prescribed by the CFPB pursuant to its authority under 12 U.S.C. § 5512 to implement the ECOA.

86.     FNB's policies and practices constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-Black and Hispanic communities in the Charlotte and Winston-Salem MSAs and engaging in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit on the basis of race, color, and national origin in violation of Regulation B. 12 C.F.R. § 1002.4(a)-(b).

87.     FNB's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

88.     Persons who have been victims of FNB's discriminatory policies and practices may have suffered damages as a result of the Bank's conduct in violation of the Regulation B, as described above.

## REQUEST FOR RELIEF

WHEREFORE, the United States and North Carolina pray that the Court enter an order that:

(1)     Declares that the conduct of Defendant First National Bank of Pennsylvania violates the Fair Housing Act;

(2)     Declares that the conduct of Defendant First National Bank of Pennsylvania violates the Equal Credit Opportunity Act and Regulation B;

23

(3)    Declares that the conduct of Defendant First National Bank of Pennsylvania violates the North Carolina Unfair and Deceptive Practices Act;

(4)    Enjoins Defendant, its agents, employees, and successors, and all other persons in active concert or participation with Defendant, from:

    A.    Discriminating on account of race, color, or national origin in any aspect of their lending business practices;

    B.    Discouraging applicants on account of race, color, or national origin;

    C.    Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant's unlawful practices to the position they would be in but for the discriminatory conduct;

    D.    Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant's unlawful practices, and providing policies and procedures to ensure all segments of Defendant's market areas are served without regard to prohibited characteristics;

(5)    Awards monetary damages against Defendant in accordance with 42 U.S.C. § 3614(d)(1)(B), 15 U.S.C. § 1691e(h), 12 U.S.C. § 5552(a)(2)(B), and 12 U.S.C. § 5565;

(6)    Awards compensatory restitution against Defendants in accordance with N.C. Gen. Stat. § 75-15.1;

(7)    Assesses a civil penalty against Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C) in order to vindicate the public interest; and

(8)    Awards the United States and North Carolina any additional relief the interests of justice may require.

# DEMAND FOR JURY TRIAL

The United States and North Carolina demand a jury trial in this case on all issues so triable.

Dated: February 5, 2024

Respectfully submitted,

FOR THE UNITED STATES:

MERRICK B. GARLAND
Attorney General

SANDRA J. HAIRSTON
United States Attorney

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Cassie L. Crawford*
REBECCA A. MAYER, TX Bar #
 24092376
CASSIE L. CRAWFORD, NCSB #
 45396
Assistant U.S. Attorneys
101 South Edgeworth Street, 4th Floor
Greensboro, North Carolina 27401
(336) 333-5351
cassie.crawford@usdoj.gov
rebecca.mayer@usdoj.gov

*/s/ Alan A. Martinson*
CARRIE PAGNUCCO
Chief
LUCY G. CARLSON
Deputy Chief
ALAN A. MARTINSON
WESTRA BEA MILLER
Trial Attorneys
Housing & Civil Enforcement Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Phone: (202) 616-2191
Fax: (202) 514-1116
alan.martinson@usdoj.gov

Attorneys for United States of America

25

FOR NORTH CAROLINA:

JOSHUA STEIN
Attorney General of North Carolina

*/s/ Jasmine S. McGhee*
JASMINE S. MCGHEE, NCSB #48424
Senior Deputy Attorney General
DANIEL P. MOSTELLER, NCSB #36958
Deputy General Counsel
A. MERCEDES RESTUCHA, NCSB #40018
Assistant Attorney General
North Carolina Department of Justice
114 West Edenton Street
Raleigh, NC 27603
Phone: (919) 716-6400
jmcghee@ncdoj.gov
dmosteller@ncdoj.gov
arestucha@ncdoj.gov

Attorneys for North Carolina

26