IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>and the STATE OF NORTH CAROLINA<br>ex rel. JOSH STEIN, Attorney General, | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | 1:24-CV-88 |
| FIRST NATIONAL BANK OF PENNSYLVANIA,<br>in its corporate capacity and as successor in interest<br>to YADKIN BANK, | )<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

## CONSENT ORDER

## I.   INTRODUCTION

The State of North Carolina and First National Bank of Pennsylvania ("the Parties")

jointly submit this Consent Order for approval and entry by the Court.  The Order resolves

all claims of Attorney General Josh Stein on behalf of the State of North Carolina ("North

Carolina") alleging that, from 2017 through 2021, First National Bank of Pennsylvania

("FNB" or the "Bank"), including as successor in interest to Yadkin Bank, which it

acquired in March 2017, engaged in a pattern or practice of unlawful redlining in violation

of the North Carolina Unfair and Deceptive Practices Act ("NCUDPA"), N.C. Gen. Stat.

§ 75-1.1 *et seq.*, and the regulations implementing the Equal Credit Opportunity Act

("Regulation B"), 12 C.F.R. § 1002.1 *et seq.*, pursuant to the authority under 12 U.S.C. §

5552(a)(2)(B), by discriminating on the basis of race, color, and national origin.

Specifically, North Carolina alleges that FNB engaged in illegal redlining by avoiding

providing home loans and other mortgage services, and engaged in discrimination and conduct that would discourage loan applications from prospective applicants who are residents of, or seeking credit in, majority-Black and Hispanic census tracts in the Charlotte, North Carolina, and Winston-Salem, North Carolina assessment areas. The Bank denies the allegations in the Complaint and maintains that it was in compliance with applicable law at all times, but seeks to resolve this matter in order to avoid prolonged litigation.

The Bank admits the Court has jurisdiction over the Parties and subject matter of this action. There have been no factual findings or adjudications in this case. The Parties enter into this Consent Order to voluntarily resolve all claims arising from the conduct alleged in the Complaint. Entry of this Consent Order is in the public interest. The Parties agree that the full implementation of the terms in this Consent Order will provide a resolution to the claims asserted in the Complaint in a manner consistent with FNB's established business interests.

## II.   BACKGROUND

FNB is a national bank with its main office in Greenville, Pennsylvania, subject to the regulatory authority of the Office of the Comptroller of the Currency ("OCC") and the Consumer Financial Protection Bureau ("CFPB"). FNB offers commercial banking, consumer banking (including mortgage lending), and wealth management services. The Bank currently maintains approximately 350 branches throughout the District of Columbia, Maryland, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, and West

Virginia. The Bank currently operates 16 branches in the Charlotte Metropolitan Statistical Area ("MSA") and 15 branches in the Winston-Salem MSA. As of November 2023, the Bank had assets of over $45 billion.

In March 2017, FNB first entered the North Carolina market by merging with North Carolina-based Yadkin Bank. FNB asserts that Yadkin Bank had historically lagged its peers in lending to majority-Black and Hispanic census tracts in the Charlotte and Winston-Salem MSAs.

In July 2022, the United States notified FNB of North Carolina's involvement in the United States' previously opened investigation into whether FNB had engaged in unlawful redlining in violation of the FHA and ECOA. FNB cooperated with North Carolina's investigation. After conducting its investigation and reviewing information provided by the Bank, North Carolina contends that, from 2017 through 2021, FNB avoided serving the credit needs of, and discouraged those residing or seeking credit in, majority-Black and Hispanic census tracts in the Charlotte or Winston-Salem MSAs from obtaining mortgage loans, while acting to serve the credit needs for mortgage loans in majority-White census tracts. FNB maintains that it has never acted to avoid serving the credit needs of borrowers in majority-Black and Hispanic census tracts or to discourage such borrowers from obtaining mortgage loans. FNB represents that, prior to the filing of the Complaint and Consent Order, it began implementing reforms to ensure that FNB was properly serving all of the communities in its footprint.

## III.  TERMS OF THE ORDER

### A.  Lending Practices

1.     FNB, including all of its officers, agents, servants, employees, and all other persons in active concert or participation with them who have actual notice of this Consent Order, assignees, and successors in interest, is hereby enjoined from engaging in any act or practice that discriminates on the basis of race, color, or national origin within the State of North Carolina that: (a) violates the NCUDPA; or (b) violates Regulation B.

2.     FNB will ensure that it offers and provides all persons within the State of North Carolina with an equal opportunity to apply for and obtain credit, regardless of the demographic composition of the area in which a person lives or the location of the property securing the loan.

3.     For purposes of this Consent Order, FNB's "Charlotte Assessment Area" consists of Iredell, Mecklenburg, Rowan, and Union Counties in North Carolina, and York County in South Carolina. FNB's "Winston-Salem Assessment Area" consists of Davidson, Forsyth, Stokes, and Yadkin Counties in North Carolina.

4.     For purposes of this Consent Order, a "majority-Black and Hispanic" census tract is one where, as of the date of this Consent Order, more than 50 percent of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau. A "majority-White" census tract is one where, as of the date of this Consent Order, more than 50 percent of the residents are identified as "non-Hispanic white" by the United States Census Bureau.

4

5. For purposes of this Consent Order, the "Effective Date" is the date this Consent Order is entered by the Court.

**B. Community Credit Needs Assessment**

6. A Community Credit Needs Assessment is a research-based market study to help a lender identify the needs for financial services in an area.

7. FNB will submit to North Carolina for non-objection a Community Credit Needs Assessment for majority-Black and Hispanic census tracts within the Charlotte and Winston-Salem Assessment Areas. This Assessment must include the following information about majority-Black and Hispanic census tracts within FNB's Charlotte and Winston-Salem Assessment Areas: (1) an evaluation (to include market research and interviews) of residential mortgage credit needs[1] and current lending opportunities available in the area; (2) recent demographic and socioeconomic data; (3) potential strategies for FNB to provide residential mortgage products and lending services in these census tracts; (4) an assessment of potential appropriate locations and hours of operation for new branches in these census tracts; (5) a review of loan products offered by other lenders and their success in the market; (6) an overview of federal, state, and local programs that are available to Charlotte and Winston-Salem Assessment Area residents seeking and obtaining residential mortgage loans; and (7) recommendations that address

---

[1] Residential mortgage credit needs include all dwelling-secured lending, including home purchase, home refinance, and home improvement loans.

how each requirement of the Consent Order should be carried out to best achieve the remedial goals of this settlement.

8.     The Community Credit Needs Assessment will be conducted by one or more independent, qualified third-party consultants selected by FNB and subject to non-objection by North Carolina. Within 60 days of the Effective Date, FNB will submit the qualifications of the third-party consultant(s) to North Carolina for non-objection. Within 30 days of receiving North Carolina's written notice of non-objection regarding the third-party consultant(s), FNB must submit to North Carolina, for non-objection, a statement of work from the independent third-party consultant(s) describing their methodology for the assessment. North Carolina agrees that the qualified consultant may rely on relevant data and other materials available to them from assessments already completed by or for FNB, to the extent the consultant concludes that those assessments are reliable, reasonably reflect current conditions, and address the required elements of the Community Credit Needs Assessment described in Paragraph 7. Within 60 days of receiving North Carolina's written notice of non-objection regarding the statement of work, FNB will submit to North Carolina the Community Credit Needs Assessment described in Paragraph 7.

9.     Once North Carolina has non-objected to the Community Credit Needs Assessment, FNB will present the Assessment to all management, employees, and committees that are responsible for overseeing fair lending compliance.

10.    Within 60 days of receiving non-objection from North Carolina regarding the Community Credit Needs Assessment, FNB will submit a remedial plan that details, in

6

light of the recommendations made in the Assessment, the actions FNB proposes to take to comply with the requirements of the Consent Order (e.g., physical expansion, loan subsidy, community partnerships, and advertising), including specific timeframes for implementation of these actions. The proposals within the plan will be subject to non-objection by North Carolina.

## C. Fair Lending Compliance

11.    FNB will retain an independent, qualified third party to conduct a detailed assessment of the Bank's fair lending program, including an assessment of its application in the Charlotte and Winston-Salem Assessment Areas, specifically as it relates to fair lending obligations and lending in majority-Black and Hispanic census tracts. FNB must produce a written report ("Fair Lending Status Report and Compliance Plan") that includes a review of the Bank's existing fair lending policies and practices, an analysis of the Bank's policies and practices related to the location of branches; loan officers' solicitation of applications, training, oversight, and compensation; marketing; and fair lending compliance monitoring. The Fair Lending Status Report and Compliance Plan will specifically include the status of progress relating to, at least:

a. The steps FNB has taken to revise the Bank's mortgage lending policies and practices that pose redlining risks, including in the Charlotte or Winston-Salem Assessment Areas, including at minimum, risk that may arise from branch locations or assignment of loan officers to branch locations, types of loan products, and marketing;

7

b.  The adoption of written policies and procedures regarding the Bank's marketing, as well as the training and monitoring of its loan officers in marketing mortgage loan products, soliciting, and originating mortgage loans;

c.  Any changes to FNB's formal process for ongoing statistical monitoring of mortgage underwriting, pricing, and redlining risk, including statistical peer analysis of applications and originations from majority-Black and Hispanic census tracts in the Charlotte and Winston-Salem MSAs;

d.  Any changes made to the reporting process of the Compliance Department to senior management and the Board of Directors once mortgage underwriting, pricing, and redlining risk have been identified and the remediation process to address such risk;

e.  Any additional steps FNB will take to promptly revise its mortgage lending policies and practices to ensure compliance with the NCUDPA and Regulation B; and

f.  Any changes to FNB's practices to improve its outreach to solicit applications for mortgage loan products, including home improvement loans.

12.    Within 60 days of the Effective Date, the Bank will submit the qualifications of the proposed third-party consultant to North Carolina.  If North Carolina objects to the selected third-party consultant, within 30 days of North Carolina's objection, FNB will

identify and propose a new third-party consultant and submit their qualifications to North Carolina for non-objection.

13.     Within 180 days of the Effective Date, the Bank will submit the Fair Lending Status Report and Compliance Plan to North Carolina for non-objection. The Fair Lending Status Report and Compliance Plan will explain which of the consultant's recommendations the Bank will adopt, when and how it will adopt and implement them, and identify the employee(s) responsible for implementation. If the Bank declines to adopt or implement a recommendation, the report will include an explanation of the decision.

14.     If North Carolina objects to any portion of FNB's Fair Lending Status Report and Compliance Plan, FNB will make revisions and resubmit its proposal within 30 days of receiving the objection. The Bank will begin implementing its Fair Lending Status Report and Compliance Plan within 30 days of receiving approval from North Carolina or as soon as practicable in view of other regulatory considerations.

15.     For the term of this Order, FNB will notify North Carolina in writing of any material changes to FNB's Fair Lending Status Report and Compliance Plan. All material changes are subject to non-objection by North Carolina.

**D.     Fair Lending Training**

16.     Within 30 days of the Effective Date, FNB will provide an electronic copy of the Complaint and Consent Order in this matter to all employees with substantive involvement in mortgage lending, marketing, or fair lending or Community Reinvestment Act compliance within the Charlotte and Winston-Salem Assessment Areas, or who have

9

management responsibility over such employees; senior management with fair lending and marketing oversight; and members of the Board of Directors (collectively, "the Relevant Bank Staff and Officials"). FNB will provide an opportunity for the Relevant Bank Staff and Officials to ask any questions concerning the Complaint and Consent Order, and FNB will provide answers. FNB will provide a report to North Carolina that lists all persons and their titles to whom this Consent Order was made available within 45 days of the Effective Date.

17.     FNB agrees to provide training to the Relevant Bank Staff and Officials on FNB's obligations under the NCUDPA, Regulation B, and this Consent Order. The training will be developed by an independent, qualified third-party trainer selected by FNB. Within 60 days of the Effective Date, FNB will submit the qualifications of the third-party trainer to North Carolina for non-objection. Within 60 days of receiving written notice of non-objection from North Carolina regarding the independent, qualified third-party trainer, FNB will deliver the training described in this Paragraph. FNB will implement a system for each individual to acknowledge that they completed fair lending training and will provide a report that includes these acknowledgements to North Carolina within 30 days after it has delivered the training. The training provided to satisfy this Paragraph may be the same training as the similar training requirement of the consent order resolving the claims of the United States.

18.     FNB agrees to continue to provide the training described in Paragraph 17 annually to the Relevant Bank Staff and Officials. The training may be held virtually or in

person. FNB will implement a system for each individual to acknowledge that they completed fair lending training. FNB will provide a report that includes these acknowledgements to North Carolina as part of its annual reporting requirement under Paragraph 45. Any proposed changes to the third-party trainer or the training curriculum are subject to non-objection by North Carolina.

19.     Any individual who becomes a Relevant Bank Staff or Official will, within 30 days of beginning the covered position, receive an electronic copy of the Complaint and Consent Order, with the opportunity to ask questions, as discussed in Paragraph 16. Any individual who becomes a Relevant Bank Staff or Official will, within 60 days of beginning the covered position, receive the training discussed in Paragraph 17. FNB will utilize its existing system for each such individual to acknowledge that they received a copy of the Complaint and Consent Order, were given the opportunity to ask questions, and that they completed fair lending training. FNB will provide a report that includes these acknowledgements to North Carolina as part of its annual reporting requirement under Paragraph 45.

20.     FNB will bear all costs associated with the trainings.

### E.     Director of Community Lending

21.     FNB will designate a full-time employee as the Director of Community Lending with the responsibility of overseeing the development of the Bank's lending in majority-Black and Hispanic census tracts in the areas where the Bank operates within the State of North Carolina, including the Charlotte and Winston-Salem Assessment Areas,

11

and the Bank's compliance with the Consent Order. FNB will maintain this position throughout the term of this Consent Order. If a new Director of Community Lending is appointed at any time during the term of this Consent Order, FNB will notify North Carolina within 10 days of the staffing change.

22.     The Director of Community Lending will report directly to a senior executive with responsibility over the Bank's mortgage operations.

23.     The Director of Community Lending will provide reports on at least a quarterly basis to the Bank's Chief Executive Officer; Director of Mortgage Lending; and the Credit Risk, Fair Lending, and CRA Committee of the Board of Directors regarding the Bank's activities related to the following:

    a.  reviewing the implementation and administration of all aspects of FNB's compliance with the Consent Order;

    b.  monitoring loan officers' solicitation and origination of loans in majority-Black and Hispanic census tracts in the Charlotte and Winston-Salem Assessment Areas, including the loan subsidy fund described herein;

    c.  coordinating the Bank's involvement in outreach programs;

    d.  encouraging and developing more lending within majority-Black and Hispanic census tracts;

    e.  promoting financial education;

    f.  providing financial counseling; and

    g.  building relationships with community groups.

### F. Physical Presence in Majority-Black and Hispanic Census Tracts

24.     Subject to appropriate regulatory approval and considering the results of the Community Needs Assessment, FNB will open or acquire two (2) new full-service branches located in majority-Black and Hispanic census tracts in the Charlotte Assessment Area and one (1) new full-service branch located in a majority-Black and Hispanic census tract in the Winston-Salem Assessment Area. The full-service branches must be in retail-oriented spaces in visible locations and have signage that is visible to the general public. The full-service branches must provide the Bank's complete range of products and services, will maintain hours of operation consistent with the range of hours maintained at other FNB branches in the Charlotte and Winston-Salem Assessment Areas, and must accept first-lien mortgage loan applications. The branching requirement of this Paragraph is not additional to the identical branching requirement of the consent order resolving the claims of the United States.

25.     FNB must make all reasonable efforts to open the new full-service branches within 30 months of the Effective Date. If FNB fails to open all three (3) full-service branches within 30 months of the Effective Date, FNB will provide to North Carolina a written proposal describing how it will comply with Paragraph 24. FNB will maintain the new full-service branches for the term of this Consent Order.

26.     FNB will evaluate future opportunities for expansion within the Charlotte and Winston-Salem Assessment Areas, whether by merger, acquisition, or opening new branches or loan production offices, in consideration of the goals of this Consent Order and

13

the Community Credit Needs Assessment. FNB must notify North Carolina of any plans to open, acquire or close any new branches or other loan production offices within these Assessment Areas at the same time that it seeks approval from regulators.

27.     FNB will assign no fewer than two (2) full-time Mortgage Bankers and two (2) Community Homeownership Specialists to solicit mortgage applications in majority-Black and Hispanic census tracts in the Charlotte and Winston-Salem Assessments Areas. FNB also agrees to and has assigned two (2) back-office staff members who will be available to assist in establishing and administering mortgage bond and down payment assistance grant programs, including those described in Paragraphs 30-33. Once the branches required by this Section have been established, the Bank will assign at least one NMLS-licensed Mortgage Banker to cover each new branch. FNB must maintain the staffing .assignment described in this Paragraph for the term of this Consent Order unless it requests and receives a written non-objection from North Carolina to the proposed staffing adjustments.

28.     The Parties agree that the employees required by Paragraph 27 of this Consent Order may work out of other branch locations, so long as they maintain a physical presence in their assigned new branch location.

29.     The Parties agree that the employees required by Paragraph 27 of the Consent Order are also permitted to process applications for borrowers throughout the Bank's lending area.

14

### G. Loan Subsidy Fund

30. FNB will invest a minimum of $11.75 million in a loan subsidy fund with the goal of increasing credit for home mortgage loans, home improvement loans, and home refinance loans extended in majority-Black and Hispanic census tracts in the Charlotte and Winston-Salem Assessment Areas. At least 70% of the funds should be used in the Charlotte Assessment Area, and at least 20% of the funds should be used in the Winston-Salem Assessment Area. The investment requirement of this Paragraph is not additional to the identical investment requirement of the consent order resolving the claims of the United States.

31. Under the loan subsidy fund, FNB will subsidize home mortgage, home improvement, and/or refinance loans made to "qualified applicants." A "qualified applicant" is any applicant who meets the Bank's underwriting criteria and:

    a. applies for a mortgage for a residential property located in a majority-Black and Hispanic census tract in the Charlotte or Winston-Salem Assessment Areas that will serve as the applicant's primary residence, or

    b. is qualified to participate in a Special Purpose Credit Program consistent with the goal of the Loan Subsidy Fund and subject to the non-objection of North Carolina.

32. Loan subsidies under the loan subsidy fund can be provided by the following means (or any combination):

a. originating a loan for a home purchase, refinancing, or home improvement at an interest rate below the otherwise prevailing market interest rate offered by FNB;

b. down payment assistance in the form of a direct grant;

c. closing cost assistance in the form of a direct grant;

d. payment of the initial mortgage insurance premium on loans subject to such mortgage insurance; and

e. any other assistance measures approved by North Carolina.

The combined forms of subsidies set forth in this Paragraph cannot exceed $22,000 per qualified applicant unless FNB receives a written non-objection from North Carolina to increase that amount.

33. No provision of the Consent Order, including any loan subsidy or equivalent program, requires FNB to make any unsafe or unsound loan or to make a loan to a person who is not qualified for the loan based upon lawful, nondiscriminatory terms; however, FNB may choose to apply more flexible underwriting standards in connection with its programs under this Consent Order. FNB's underwriting standards applied to residents of majority-Black and Hispanic census tracts must be no less favorable than the standards applied in majority-White census tracts.

## H. Advertising, Outreach, Consumer Financial Education, and Credit Initiatives

34. FNB will spend at least $150,000 per year ($750,000 over the term of this Consent Order) on advertising, outreach, consumer financial education, and credit counseling targeted toward majority-Black and Hispanic census tracts in the Charlotte and

Winston-Salem Assessment Areas. At least 70% of this amount should be spent on the Charlotte Assessment Area, and at least 20% of this amount should be spent on the Winston-Salem Assessment Area. The spending requirement of this Paragraph is not additional to the identical spending requirement of the consent order resolving the claims of the United States.

35.     Within 45 days of receiving non-objection from North Carolina regarding the Community Credit Needs Assessment described in Section III.B., FNB will submit a written Advertising, Outreach, Education, and Credit Program Plan ("Outreach Plan") to North Carolina detailing how it will spend these funds for the period remaining in the term of the Consent Order. The Outreach Plan will include an explanation of why FNB selected certain approaches and community partnerships and how FNB's advertising, community outreach, community financial education, and credit counseling initiatives will meet the credit needs identified in the Community Credit Needs Assessment. The Outreach Plan will be subject to non-objection by North Carolina. If North Carolina objects to any portion of the Outreach Plan, FNB will make revisions and resubmit its proposal within 30 days of receiving North Carolina's objection. FNB will begin implementation of its Outreach Plan within 30 days of receiving written notice of non-objection from North Carolina.

36.     FNB will evaluate the strategies outlined in its Outreach Plan annually, including by considering the Community Credit Needs Assessment, in order to identify any changes necessary to better assist residents of majority-Black and Hispanic census tracts in the Charlotte and Winston-Salem Assessment Areas in obtaining credit. FNB will

17

present a summary of its evaluation and any proposed changes to North Carolina as part of its annual reporting requirement under Paragraph 45. Any proposed changes will be subject to non-objection by North Carolina.

a. <u>Advertising</u>

37.     FNB will endeavor to effectively advertise its residential loan products, including products for which the loan subsidy fund outlined in Section III.G. will be applied, to majority-Black and Hispanic census tracts in its Charlotte and Winston-Salem Assessment Areas in order to generate mortgage loan applications from qualified applicants in these census tracts. FNB's advertising may include print media, radio, Internet advertising, television, direct mail, and any other appropriate medium. These advertisements must include similar information to other advertisements by FNB. FNB must advertise its mortgage lending services and products to majority-Black and Hispanic census tracts in its Charlotte and Winston-Salem Assessment Areas at least to the same extent that it advertises its mortgage lending services and products to majority-White census tracts in those same assessment areas.

38.     All of FNB's print advertising and promotional materials referencing residential mortgage loans must contain an equal housing opportunity logo, slogan, or statement. FNB agrees that all radio or television advertisements will continue to include an audible statement that FNB is an "Equal Opportunity Lender" or "Equal Housing Lender."

39. FNB will continue to provide language interpretation and translation services and will maintain and develop, as appropriate, consumer resources in Spanish. FNB will create Spanish-language content, including a link on its website (https://www.fnb-online.com), digital application platforms, and other digital points of access for customers to schedule appointments with a Spanish-speaking employee or a non-Spanish-speaking employee with the use of a third-party interpretation service, and to access other resources. When providing language interpretation services, interpretation will be conducted using a live person and not solely reliant on artificial intelligence technology.

b. <u>Outreach</u>

40. FNB agrees to provide at least four (4) outreach programs per year for real estate brokers and agents, developers, and public or private entities engaged in residential real estate-related business in majority-Black and Hispanic census tracts in its Charlotte and Winston-Salem Assessment Areas to inform them of its products and services and to develop business relationships.

c. <u>Consumer Financial Education and Credit Initiatives</u>

41. FNB agrees to deploy a consumer financial education program designed to provide information, training, and counseling services about consumer finance and credit establishment and repair to individuals in majority-Black and Hispanic census tracts in its Charlotte and Winston-Salem Assessment Areas.

42. FNB agrees to provide a minimum of six (6) seminars per year, with translation and interpretation services in Spanish, for residents in majority-Black and

19

Hispanic census tracts in its Charlotte and Winston-Salem Assessment Areas and held in locations intended to be convenient to those residents. These seminars will cover credit counseling, financial literacy, and other related consumer financial education, to help identify and develop qualified loan applicants from those areas.

43.     Beginning after the Effective Date and during the first year of the term of the Consent Order, FNB may conduct the outreach programs and consumer education seminars described in Paragraphs 38, 40, and 42 by hosting in-person events offered at a location reasonably convenient to the attendees or by hosting virtual events. Beginning 12 months after the Effective Date, FNB will submit to North Carolina a list of its planned outreach programs and consumer financial education seminars, specifying any associated community-based or governmental organizational partners and whether those events will be in-person or virtual, as part of its annual reporting requirement under Paragraph 45. The virtual nature of these programs and seminars will be subject to non-objection by North Carolina.

## IV.     EVALUATING AND MONITORING COMPLIANCE

44.     For the duration of this Consent Order, FNB will retain all records related to its obligations under this Consent Order and all activities to carry out this Order. North Carolina has the right to review and copy these records upon request.

45.     Beginning 12 months after the Effective Date, FNB will submit annual reports to North Carolina on its progress in complying with the terms of the Consent Order and associated plans and programs. The final report will be delivered to North Carolina at

least 60 days prior to the expiration of the Consent Order. The reports will provide a complete account of FNB's actions to comply with the Consent Order, FNB's assessment of the extent to which each obligation was met, if FNB falls short of meeting its goals under the Consent Order, an explanation of why FNB fell short for any particular component, and recommendations for additional actions to achieve the goals set forth in the Consent Order and associated plans and programs.

The annual reports shall also include an accounting of all subsidies made and mortgage loans originated under the loan subsidy program described in Section III.G. to date, including the following information: the HMDA LAR universal loan identifier for the subsidized loan; closing date; address of the property securing the loan; census tract location of the property securing the loan; ethnicity and/or race of the borrower; loan type; loan purpose; loan amount; loan subsidy amount; and loan subsidy type (i.e., down payment assistance, closing cost assistance). The annual reports will also indicate which of the loans benefitting from the loan subsidy fund were made to first-time homeowners. FNB will attach to its reports copies of training materials and advertising and marketing materials distributed under this Consent Order as well as a detailed list of outreach and education events. FNB's Board of Directors and CEO will review and approve the reports.

If North Carolina raises any objections to a report, the Parties will have 14 days to confer and resolve their differences. The Parties may mutually agree to additional time to confer, if necessary. If the Parties are unable to resolve their differences, either Party may bring the dispute to the Court for resolution.

46.     All materials required by this Consent Order will be sent to North Carolina by email to the North Carolina Department of Justice attorney(s) assigned to this matter. North Carolina will notify FNB in writing if the assigned attorneys change. FNB may submit identical materials to North Carolina as it submits to the United States for all materials required by both this Consent Order and the consent order resolving the claims of the United States.

47.     Upon request by the North Carolina Department of Justice attorney(s) assigned to this matter, North Carolina may request that FNB submit materials required by this Consent Order by commercial overnight delivery service addressed as follows:

> Director, Consumer Protection Division
> North Carolina Department of Justice
> 114 W. Edenton Street
> Raleigh, NC 27603

## V.     ADMINISTRATION

48.     The requirements of this Consent Order will remain in effect for five (5) years.

49.     If, within five (5) years of the Effective Date, FNB has not invested all money in the loan subsidy fund described in Section III.G., then Section III.G. of the Consent Order will remain in full effect until three (3) months after FNB has invested all the money in the loan subsidy fund and has submitted a final report to North Carolina that demonstrates the fulfillment of this obligation.

50.     FNB will maintain all documents and records necessary to demonstrate full compliance with the Consent Order, including all submissions made to North Carolina,

until the requirements of Paragraphs 48 and 49 are fulfilled. FNB must make these documents available to North Carolina upon North Carolina's request.

51. North Carolina may take steps to monitor FNB's compliance with this Consent Order including, but not limited to, conducting tests of FNB's mortgage lending operations or any location(s) in which FNB employees or agents engage in residential real estate-related transactions.

52. Any time limits for performance may be extended by mutual written agreement of the Parties. Other modifications may be made only upon approval of the Court, by motion by any Party. If there are changes in material factual circumstances, the Parties will work cooperatively to discuss and attempt to agree to proposed modifications to the Consent Order.

53. North Carolina agrees that, in every instance where its non-objection is required in the Consent Order, such non-objection shall be timely provided and shall not be unreasonably withheld. North Carolina agrees that it will coordinate with the United States in reviewing for non-objection.

54. If disputes arise about the interpretation of, or compliance with, the Consent Order, the Parties will endeavor in good faith to resolve any dispute before bringing it to the Court for resolution. If FNB violates any provision of the Consent Order or fails to perform an act required by the Consent Order, North Carolina may move the Court to impose any remedy authorized by law or equity, including attorneys' fees and costs.

55.     Nothing in the Consent Order excuses FNB's compliance with any currently or subsequently effective provision of law or order of a regulator. Should FNB's primary regulator have concerns regarding compliance with banking regulations and this Consent Order, North Carolina agrees to confer with FNB and its primary regulator regarding said compliance.

56.     FNB will notify North Carolina of any development that may materially affect compliance obligations arising under this Order, including but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; the filing of any bankruptcy or insolvency proceeding by or against FNB; or a change in FNB's name or address. FNB will provide this notice as soon as practicable after learning about the development.

57.     Within 10 days of the Effective Date, FNB will:

    a.  Designate at least one telephone number and email, physical, and postal address as points of contact, which North Carolina may use to communicate with FNB;

    b.  Identify all businesses for which FNB is the majority owner, or that FNB directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; and

    c.  Describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

58.     FNB will report any change in the information required to be submitted under Paragraph 57 as soon as practicable.

59.     This Order is binding on FNB, including all of its officers, agents, servants, employees, and all other persons in active concert or participation with them who have actual notice of this Consent Order, assignees, and successors in interest. If FNB seeks to transfer or assign all or part of its operations to a successor or assign that intends to carry on the same or similar business, FNB will obtain the written agreement of the successor or assign to obligations under the Consent Order as a condition of sale, merger, or other transfer.

60.     The Parties agree that litigation is not reasonably foreseeable. If any Party implemented a litigation hold to preserve information, the Party is no longer required to maintain it. Nothing in this Paragraph relieves either Party of any other obligations imposed by the Consent Order.

61.     The Parties to this Consent Order will bear their own costs and attorneys' fees.

62.     The Court will retain jurisdiction over this civil action to enforce the terms of this Consent Order.


**SO ORDERED**, this 13th day of February, 2024.

_____
CHIEF UNITED STATES DISTRICT JUDGE

The undersigned hereby apply for and consent to the entry of the Order:

**FOR THE STATE OF NORTH CAROLINA, BY AND THROUGH ITS ATTORNEY GENERAL JOSH STEIN:**

/s/  Jasmine S. McGhee
JASMINE S. MCGHEE, NCSB #48424
Senior Deputy Attorney General
DANIEL P. MOSTELLER, NCSB #36958
Deputy General Counsel
A. MERCEDES RESTUCHA, NCSB #40018
Assistant Attorney General
North Carolina Department of Justice
114 West Edenton Street
Raleigh, NC 27603
Phone: (919) 716-6400
jmcghee@ncdoj.gov
dmosteller@ncdoj.gov
arestucha@ncdoj.gov

*Attorneys for the State of North Carolina*

**FOR FIRST NATIONAL BANK OF PENNSYLVANIA:**

/s/  James W. Cooper
JAMES W. COOPER
MICHAEL MANCUSI
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave NW
Washington, DC 20001
Telephone: (202) 942-5000
James.W.Cooper@arnoldporter.com
Michael.Mancusi@arnoldporter.com

*Attorneys for First National Bank of Pennsylvania*

26